AO 91 (Rev. 11/11) Criminal Complaint




Trial Attorney Victor B. Yanz (202) 957-2993

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

TAIR SMAGUL

CASE NUMBER: 1:24 - cr - 00434

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. From in or around December 2023 to in or around September 2024, in the Northern District of Illinois, Eastern Division, and elsewhere, TAIR SMAGUL, the defendant, violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1956(h) | did knowingly conspire to engage in one or more monetary transactions in criminally derived property of a value greater than $10,000, which property was derived from one or more specified unlawful activities, namely health care fraud, in violation of Title 18, United States Code, Section 1347, knowing that the transaction involved criminally derived property, in violation of Title 18, United States Code, Section 1957. |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

_____

STEVE WARREN
Special Agent, HHS-OIG-OI

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: September 12, 2024        _____

*Judge's signature*

City and state: Chicago, Illinois        _____

Young B. Kim, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, Steven Warren, being duly sworn, state as follows:

1.      I am a Special Agent with the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations ("HHS-OIG-OI") and have been so employed since July 2010.  In my capacity as a Special Agent, I have participated in numerous investigations of criminal activity involving, among other things, health care fraud, money laundering, wire fraud, and mail fraud. During the course of these investigations, I have conducted or participated in surveillance, the execution of arrest and search warrants, debriefings of informants and other witnesses, reviews of taped conversations, analysis of financial and telephone records, and I have reviewed claims data, medical records, and other business records.  As a result of my training and experience, I am familiar with techniques and methods of operation used by individuals involved in criminal activity to facilitate various kinds of fraud and to conceal their activities from detection by law enforcement authorities.  In addition to my work experience, I have received specialized training in the field of health care fraud from the HHS-OIG-OI and others.

2.      This affidavit is being submitted in support of a criminal complaint.  For the reasons set forth below, I respectfully submit that this affidavit contains probable cause to believe that TAIR SMAGUL ("SMAGUL") has violated Title 18, United States Code, Section 1956(h) (Conspiracy to Commit Money Laundering).  I make this

affidavit based upon personal knowledge derived from my participation in this investigation and upon information communicated or reported to me during the investigation by other participants in the investigation. This affidavit is intended to show only that there is probable cause to support the complaint for the requested arrest warrant. This affidavit does not set forth all of my knowledge about this matter.

## FACTS SUPPORTING PROBABLE CAUSE

### I.  BACKGROUND

#### A.  Relevant Individuals and Entities

3.     According to United States Customs and Border Protection ("CBP") records, the defendant SMAGUL, a Kazakhstan national believed to be residing in Cook County, Illinois, landed at John F. Kennedy International Airport in Queens, New York on or about May 19, 2023, entering the United States on a Kazakhstan passport with a United States student's Visa.

4.     According to corporate records filed with the Secretary of State of Connecticut, at certain times, SMAGUL controlled durable medical equipment ("DME") company MEDICAL HOME CARE INC. ("MEDICAL HOME CARE").

5.     According to financial institution records, CBP records, and corporate records filed with the Secretary of State of Connecticut, Co-conspirator 1, a Czech national, previously controlled MEDICAL HOME CARE and other various DME companies that participated in the scheme discussed below and was a signatory on

2

those entities' financial accounts while he resided in the United States from approximately January 2023 through March 2023.

6.      According to CBP records and corporate records filed with the Secretary of State of Connecticut, Co-conspirator 2, an Estonian national, resided in the United States from approximately October 22, 2023, until December 2023, and at times also controlled MEDICAL HOME CARE and other DME companies that also participated in the scheme discussed below.

7.      According to corporate records filed with the Secretary of State of Connecticut, MEDICAL HOME CARE was formed in 1977 by Individual 1, and was located in Fairfield County, Connecticut. According to Medicare records, MEDICAL HOME CARE operates as a DME provider and has been approved by Medicare to supply medically necessary DME to Medicare beneficiaries. According to sale documentation records, starting on March 17, 2023, Co-conspirator 1 controlled MEDICAL HOME CARE. According to corporate records filed with the Secretary of State of Connecticut, Co-conspirator 2 took over control of MEDICAL HOME CARE on approximately October 20, 2023, as its President, Secretary, and Treasurer. According to sale documentation records, Co-conspirator 2 then sold MEDICAL HOME CARE to SMAGUL on November 30,2023 (notarized on December 14, 2023). According to corporate records filed with the Secretary of State of Connecticut, on December 8, 2023, an Interim Notice was filed with the Secretary of State of Connecticut, adding SMAGUL as President, Secretary, and Treasurer of MEDICAL HOME CARE, and removing Co-conspirator 2 of their titles.

8.     Billing Company 1, formed in 1996 with its principal place of business in Frederick County, Maryland, operates a medical claim entry business that contracts with providers to assist them in submitting claims to Medicare and other health care benefit programs.

A.     Relevant Financial Accounts

9.     MEDICAL HOME CARE held business accounts at various financial institutions from March 2023 to the present.

10.     According to financial institution records, Co-conspirator 1, as a prior owner of MEDICAL HOME CARE, controlled financial accounts for MEDICAL HOME CARE at Financial Institution 1 and at Financial Institution 2 from approximately March 17, 2023, through September 2023.

11.     According to financial institution records, Co-conspirator 2 then controlled financial accounts for MEDICAL HOME CARE at Financial Institution 3 starting from approximately October 25, 2023, and then at Financial Institution 4 starting from approximately December 8, 2023.

12.     According to financial institution records, SMAGUL then opened and controlled financial accounts for MEDICAL HOME CARE at Financial Institution 5 from approximately December 19, 2023, at Financial Institution 6 starting from approximately December 20, 2023, and at Financial Institution 7 starting from approximately January 4, 2024, through April 3, 2024.

B. <u>The Medicare Program</u>

13.     The Medicare program ("Medicare") is a federally funded health insurance program providing health benefits to individuals who are 65 years old or disabled.  Medicare is administered by the Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS").

14.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

15.     Individuals who qualify for Medicare benefits are commonly referred to as "beneficiaries."  Each beneficiary is given a unique Medicare identification number.

16.     Medicare covers different types of benefits, which are separated into different program "parts:" Medicare Parts A through D.  Medicare Part B covers medically necessary physician services and outpatient care, including DME, such as prosthetics, orthotics, continuous glucose monitors, urinary catheters, and braces.

17.     DME companies, physicians, and other health care providers (collectively, "providers") that provide items or services to beneficiaries are able to apply for and obtain a National Provider Identifier ("NPI").  To participate in Medicare, providers are required to submit an enrollment application.  As provided in the application, every provider is required to meet certain standards to obtain and retain billing privileges to Medicare, including: (1) provide complete and accurate information on the application, with any changes to the information on the

application reported within 30 days; (2) disclose persons and/or organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations, and program instructions; (4) acknowledge that the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to present a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity. Providers are provided with online access to Medicare manuals and service bulletins describing proper billing procedures and billing rules and regulations.

18.    Upon a change in ownership or managing control to an enrolled Medicare provider, the provider is required to re-submit an enrollment application setting forth details of the new ownership or managing control, including the names of all owners and managing employees, contact information, and a certification by any new individuals that they will abide by Medicare rules and regulations. The enrollment application must be approved by Medicare before the provider can be reimbursed for claims following a change in ownership or managing control.

19.    If Medicare approves the application, Medicare assigns the provider a Provider Transaction Access Number ("PTAN"). Providers assigned a Medicare PTAN to render services to beneficiaries can submit claims for reimbursement to Medicare that include the PTAN assigned to that provider. Payments under Medicare are often made directly to the provider rather than to a Medicare

beneficiary. This payment occurs when providers submit the claim to Medicare for payment, either directly or through a billing company. CMS contracts with various companies to receive, adjudicate, process, and pay Medicare Part B claims, including claims for DME.

20. Under Medicare Part B, DME is required to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury, ordered by a medical professional, properly documented, and provided as represented to Medicare.

21. Medicare uses the term "ordering/referring" provider to identify the physician or nurse practitioner who orders, refers, or certifies an item or service reported in that claim. Individuals who order, refer, or certify these items or services are required to have the appropriate training, qualifications, and licenses.

22. A Medicare claim is required to set forth, among other things, the beneficiary's name, the date the items or services are provided, the cost of the items or services, the name and identification number of the physician or other health care provider who orders the items or services, and the name and identification number of the provider who provides the items or services. Providers convey this information to Medicare by submitting claims using billing codes and modifiers.

23. Medicare regulations require providers to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom items or services are provided and for whom claims for payment are submitted.

Medicare requires complete and accurate patient records so that Medicare can verify that the items or services are provided as described on the claim form and to permit Medicare to review the appropriateness of payments made to providers.

24.     Medigap, also known as Medicare Supplement insurance, helps fill "gaps" of Medicare coverage and is sold by private health insurance companies. A Medigap plan can help pay some of the remaining health care costs not covered by Medicare, such as copayments, coinsurance, and deductibles.  For DME claims, a Medigap plan generally covers the beneficiary's deductible which is approximately 20% of the claim's allowed amount.

25.     Medigap is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

## II.     THE FRAUDULENT SCHEME

### A.  Overview of Investigation

26.     This investigation began in Spring 2023, when the Federal Bureau of Investigation ("FBI") and HHS-OIG-OI identified a scheme to defraud Medicare and Medigap Supplemental Insurers by submitting claims for DME, specifically continuous glucose monitors and urinary catheters, which were neither medically necessary nor provided as represented to Medicare.  The investigation revealed that the perpetrators purchased DME companies that were already enrolled with Medicare, changed the ownership information with the respective secretaries of state, but failed to submit enrollment applications reflecting the change in ownership with Medicare.  Following the sale, the DME companies electronically submitted tens to

hundreds of millions of dollars of claims for DME, primarily continuous glucose monitors and urinary catheters, that were not medically necessary and were not dispensed to beneficiaries as represented to Medicare.  Investigators have identified at least twenty DME companies across the country that participated in this scheme, including MEDICAL HOME CARE.  SMAGUL is the listed owner of MEDICAL HOME CARE.

B.  Medical Home Care Inc.

27.     At the time of MEDICAL HOME CARE's formation, Individual 1 was listed as its President with the Secretary of State of Connecticut.

28.     According to sales documentation and witness interviews, on or about March 17, 2023, MEDICAL HOME CARE was sold to Co-conspirator 1 for a purchase price of approximately $400,000.00.

29.     On or about March 17, 2023, an Interim Notice was filed with the Secretary of the State of Connecticut, listing Co-conspirator 1 as President and deleting Individual 1.

30.     When Co-conspirator 1 took ownership of MEDICAL HOME CARE, a Medicare enrollment application was not submitted for this change of ownership, as required by Medicare.  According to witness interviews, prior to the purchase of MEDICAL HOME CARE, Individual 1 was instructed to open an account at Financial Institution 1 in the name of MEDICAL HOME CARE and submit an updated Electronic Funds Transfer ("EFT") authorization to the Medicare Provider Enrollment, Chain, and Ownership System ("PECOS"), providing that Medicare

9

monies for claim reimbursement to MEDICAL HOME CARE be electronically deposited into the account with Financial Institution 1. According to sales documentation records, as part of the purchase agreement, this account was transferred to Co-conspirator 1, who became the sole signatory on this account.

31.     According to CBP records, Co-conspirator 1 left the United States on or about March 24, 2023.

32.     According to corporate records, on or about October 20, 2023, an Interim Notice was filed with the Secretary of the State of Connecticut, listing Co-conspirator 2 as President, Secretary, and Treasurer, and removing Co-conspirator 1. Again, contrary to the requirement of Medicare, no Medicare enrollment application was submitted to Medicare reflecting this change in ownership.

33.     According to financial institution records and sales documentation records, on or about November 30, 2023, Co-conspirator 2 sold MEDICAL HOME CARE to SMAGUL. According to records filed with the Secretary of State of Connecticut, on or about December 8, 2023, an Interim Notice to MEDICAL HOME CARE was filed with the Secretary of the State of Connecticut listing SMAGUL as President, Secretary, and Treasurer, and deleting Co-conspirator 2. Again, contrary to the requirement of Medicare, no Medicare enrollment application was submitted to Medicare reflecting this change in ownership.

C.  Beneficiary Complaints

34.     Beginning on or about April 7, 2023, Medicare began receiving telephone calls from beneficiaries to Medicare's complaint hotline, 1-800-MEDICARE, about

MEDICAL HOME CARE. The hotline receives calls from the public regarding any Medicare-related issue, including fraud, waste, abuse, or quality of care issues. Between April 7, 2023, and February 9, 2024, Medicare received approximately 27,377 beneficiary complaints listing MEDICAL HOME CARE as the subject of the complaint, and many of the beneficiaries reported that they received no items or services from MEDICAL HOME CARE.

D. Site Inspection

35. On May 4, 2023, a Thursday, at 10:47 am, investigators conducted surveillance of MEDICAL HOME CARE and observed a female unlocking the door of MEDICAL HOME CARE, entering the business, and turning on the lights.

36. On August 23, 2023, a Wednesday, investigators conducted surveillance of MEDICAL HOME CARE from approximately 9:36 am to 11:25 am. Investigators observed that the lights of the location were off, the door was locked, and mail was in the company's mailbox. No occupants were observed within the site, and no one arrived during the surveillance. A photograph of the location is depicted below.



11

E. Interviews with Former Owner and Employee of MEDICAL HOME CARE

37.    On June 16, 2023, investigators interviewed the former owner of MEDICAL HOME CARE, Individual 1, who advised that he/she receives daily phone calls from people in other states complaining about items billed by MEDICAL HOME CARE, including catheters that the patients stated they never received. Individual 1 described the sale process as the "strangest deal" he/she had ever been involved in. Individual 1 explained he/she never met Co-conspirator 1 but did see a copy of Co-conspirator 1's driver's license and recalled it was from the State of Texas. Individual 1 stated that the buyers did not want any of MEDICAL HOME CARE's equipment, software, or employees, but requested that the former owner open a new business account at Financial Institution 1 and that the Medicare EFTs be processed into that new account.

38.    On August 18, 2023, investigators interviewed an employee of MEDICAL HOME CARE (Employee 1), who advised as follows:

    a.    Employee 1 had been working for MEDICAL HOME CARE for approximately six months and was hired after responding to a posting for an office manager position on Indeed.com and being interviewed by Co-Conspirator 3.

    b.    Employee 1 works at MEDICAL HOME CARE a few times a week, and their duties are obtaining and going through the mail, scanning and faxing the mail, and sending it to the owners, including Co-Conspirator 3.

12

c.      Employee 1 was told by Co-conspirator 3 that MEDICAL HOME CARE was not officially open, and that Employee 1's job was to take care of the office and the mail until the business opened.

d.      No other employees came to the business, and that the only individuals who came to MEDICAL HOME CARE did so to complain that they did not get the goods billed by the company.  Employee 1 explained that MEDICAL HOME CARE was not selling anything, and that there were no products coming in or out of the company.

F.  <u>Beneficiary and Provider Interviews</u>

39.    Investigators interviewed nineteen total beneficiaries, including five residing in Illinois who allegedly received urinary catheters from MEDICAL HOME CARE, and three medical providers who allegedly prescribed catheters to those beneficiaries.  All nineteen beneficiaries interviewed denied receiving any catheters from MEDICAL HOME CARE.  According to Medicare records and corporate records filed with the Secretary of State of Connecticut, claims for DME were submitted for one of the Illinois beneficiaries after SMAGUL assumed control over MEDICAL HOME CARE.

40.    The three referring providers interviewed denied prescribing and/or ordering catheters and additionally denied that any of the identified individuals were patients of their respective practices.

G.  <u>Medicare Billing Records</u>

13

41.     An analysis of the billing records of MEDICAL HOME CARE revealed a high number of claims filed for beneficiaries who had been deceased for 30 or more days. For example, from March 17, 2023, through June 1, 2024, claims were filed by MEDICAL HOME CARE for approximately 711 beneficiaries who were deceased for 30 or more days. Based on my training and experience, Medicare providers who repeatedly bill for items or services provided to dead beneficiaries are often using Medicare beneficiary information that has been purchased or unlawfully transferred, rather than collected in the ordinary course of their provision of bona fide medical services to beneficiaries. As such, repeated billing of items or services to dead beneficiaries is an indicator that the entity is engaged in fraudulent billing for items or services that are not medically necessary and/or not actually provided.

42.     According to records obtained from Medicare, on or about May 17, 2023, MEDICAL HOME CARE began submitting claims to Medicare for urinary catheters in a significant and unusual manner. From approximately May 17, 2023, to June 1, 2024, MEDICAL HOME CARE billed 469,288 claims for 96,146 Medicare beneficiaries, totaling approximately $952,802,335.00 billed to Medicare for urinary catheters for an intended paid amount of approximately $152,305,817.00. Over $29 million in claims were submitted for Medicare beneficiaries residing within the Northern District of Illinois.

43.     Medicare processed these claims for reimbursement to MEDICAL HOME CARE but began suspending payments to MEDICAL HOME CARE on or about May 2, 2023. As a result, Medicare stopped payments and suspended all claims

14

reimbursement to MEDICAL HOME CARE before Medicare funds were actually paid.

44. However, records obtained from Medicare show that Medigap Supplemental insurers, as a result of the processed claims, received reimbursement requests from MEDICAL HOME CARE valued for at least $3,130,452.00. Medigap Supplemental insurers then issued various checks to MEDICAL HOME CARE for a portion of those reimbursement requests. As of September 9, 2024, investigators have identified through financial institution records that at least $854,080 of that total was deposited into MEDICAL HOME CARE's financial accounts between January 2024 and February 2024, when SMAGUL owned and controlled MEDICAL HOME CARE.

H. Fraudulent Health Care Claims Submissions After SMAGUL's Takeover

45. According to Medicare and corporate records from the Secretary of State of Connecticut, MEDICAL HOME CARE continued to submit claims seeking reimbursement for DME after SMAGUL obtained ownership and control over the company. There is currently no evidence suggesting any of these claims were legitimate.

46. According to Medicare records, claims were even submitted after Medicare revoked MEDICAL HOME CARE's enrollment as of November 17, 2023. In total, 228,570 claims were submitted to Medicare on the following dates: December 18, 2023, December 20, 2023, January 9, 2024, January 10, 2024, and January 18, 2024. These claims attempted to collect an additional $477,711,300 during

SMAGUL's ownership of MEDICAL HOME CARE. All of these claims were denied by Medicare as being fraudulent.

I.   Interactions with Other Co-Conspirators

47.   As noted in paragraph 26 above, at least twenty DME companies have participated in this scheme throughout the United States. Investigators have determined that SMAGUL has ongoing telephonic contact with the DME owners of two of these identified DME companies: Co-Conspirator 4 and Co-Conspirator 5.

48.   Toll records for cell phone numbers subscribed to in the name of Co-Conspirator 4, and Co-Conspirator 5 were obtained. Toll records were also obtained for a phone number investigators determined to be used by SMAGUL based upon account records and audio recordings from financial institutions showing that phone number upon MEDICAL HOME CARE financial accounts SMAGUL controlled as the sole signatory.

49.   Toll records for the three phone numbers show that between approximately September 19, 2023, and August 19, 2024, SMAGUL had approximately 795 telephonic contacts with Co-Conspirator 4, and approximately 934 telephonic contacts with Co-Conspirator 5.

50.   Records were also obtained from financial institutions showing SMAGUL, Co-conspirator 4, and Co-conspirator 5 maintained personal bank accounts. The financial institution records show SMAGUL, Co-Conspirator 4, and Co-Conspirator 5 were the sole signatories on their personal accounts. Investigators analyzed the financial institution records from those accounts and observed

significant money transfers between all three accounts. For example, between February 2024 and July 2024, money transfers between SMAGUL and Co-Conspirator 4 occurred multiple times per week.

### III.    LAUNDERING OF FRAUD PROCEEDS

  A.  Financial Accounts of MEDICAL HOME CARE

51.    A review of MEDICAL HOME CARE's financial records did not reveal financial activity consistent with the running of a large-scale urinary catheter business. For example, a detailed review was unable to conclusively identify a large and consistent stream of expenses tied to business activities typically expected with the operation of a urinary catheter business, such as catheter purchases, shipping and packaging fees, and/or storage fees. Furthermore, most of the funds that flowed into the MEDICAL HOME CARE financial accounts were then quickly withdrawn, with some funds being sent to foreign bank accounts, including to accounts in China.

  B.  Banking and Financial Transactions Conducted by SMAGUL

52.    According to financial institution records, on or about December 19, 2023, SMAGUL entered a branch of Financial Institution 5 located in Danbury, Connecticut, seeking assistance to open a bank account for MEDICAL HOME CARE. According to financial records, SMAGUL advised the banking representative during the meeting that he was the owner of MEDICAL HOME CARE and had sole control of the entity which sold DME. SMAGUL even provided the representative with a Kazakhstan passport in his name to confirm his identity. SMAGUL's passport photograph is depicted below.



53.    According to financial institution records, multiple withdrawals of health care fraud proceeds were made from MEDICAL HOME CARE's account at a Financial Institution 5 bank branch located within the Northern District of Illinois. For example, on or about February 8, 2024, and February 9, 2024, four withdrawals totaling approximately $20,000 in health care fraud proceeds were made at ATMs located within the Northern District of Illinois, when SMAGUL was the only signer on the account. These withdrawals constituted fraud proceeds because only check deposits from Medigap Supplemental insurance companies provided a sufficient balance in MEDICAL HOME CARE's account at Financial Institution 5 to perform these withdrawals, since there were no significant deposits from another source.

54.    According to financial institution records, on or about December 20, 2023, SMAGUL opened a bank account at Financial Institution 6 for MEDICAL HOME CARE in a Fairfield, Connecticut branch. According to financial institution records, during the meeting to open the account, SMAGUL listed his personal address of 829 Dighton Lane, Schaumburg, Illinois, and advised the banking representative that he was the owner of MEDICAL HOME CARE and

had sole control of the entity, which sold DME. According to financial institution records, SMAGUL stated to the banking representative that he buys equipment from Russia and sells it in Kazakhstan. SMAGUL provided the banking representative with a Kazakhstan passport in his name to confirm his identity and presented a Bill of Sale dated November 30, 2023, indicating his purchase of MEDICAL HOME CARE from Co-conspirator 2. According to financial institution records, from approximately March 12, 2024, to March 18, 2024, a series of transactions, including ATM withdrawals and Internet Protocol log activity associated with this account at Financial Institution 6, were conducted within the Northern District of Illinois. These withdrawals consisted of fraud proceeds because the MEDICAL HOME CARE account at Financial Institution 6 was only funded with a single deposit, which was a check drawn upon MEDICAL HOME CARE's account at Financial Institution 5. As explained above in paragraph 54, the funds within MEDICAL HOME CARE's account at Financial Institution 5 consisted of fraud proceeds. A photograph of this check deposited into the MEDICAL HOME CARE account at Financial Institution 6 is depicted below.

**MEDICAL HOME CARE INC.**
32 STONY HILL RD
BETHEL, CT 06801-1167

1021
51-110/211 7719

01.05.2024
Date

Pay to the Order of _Medical Home Care Inc._ | $ 5000.00

_Five thousand_ Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
Connecticut
wellsfargo.com

For _____

55.   According to witness interviews and financial institution records, on or about January 4, 2024, SMAGUL entered a bank branch of Financial Institution 7 located in Danbury, Connecticut, again seeking assistance to open a bank account for the medical supply company that he owned, MEDICAL HOME CARE.   During the meeting, SMAGUL advised the banking representative that he was the owner of MEDICAL HOME CARE and had sole control of the entity, which sold DME.   SMAGUL provided the banking representative with a Kazakhstan passport in his name to confirm his identity.   SMAGUL was captured on surveillance video inside the branch, at approximately 12:09 pm, as depicted below.



56.     According to financial institution records and witness interviews, on or about January 11, 2024, SMAGUL appeared at a Financial Institution 7 branch, located in Newtown, Connecticut, regarding MEDICAL HOME CARE's bank account being restricted, which prevented him from making deposits into the accounts. Through interviews with financial institution representatives, investigators learned that Financial Institution 7 believed the deposit activity into the account was suspicious and upon researching MEDICAL HOME CARE through bank resources, Financial Institution 7 discovered other banks had flagged the company for suspicious activity.   As a result, Financial Institution 7 froze MEDICAL HOME CARE's account.   According to witness interviews, financial institution records, and

21

surveillance video, on or about February 12, 2024, SMAGUL then went to a Financial Institution 7 branch, located in Danbury, Connecticut, and requested MEDICAL HOME CARE's account restriction be lifted so SMAGUL could make a withdrawal. SMAGUL was captured on surveillance video inside this bank branch at approximately 4:15 pm, as depicted below.



57.     According to an interview with a financial institution representative, on April 2, 2024, SMAGUL entered a Bethel, Connecticut branch of Financial Institution 7 to close out MEDICAL HOME CARE's bank account. While investigators conducted surveillance at this bank branch at approximately 9:24 am on April 3, 2024, a vehicle was observed arriving at the bank. Through databases available to law enforcement, investigators identified the license plate on the vehicle as registered to SMAGUL.

Through a comparison between SMAGUL's passport photograph and the investigator's observations, investigators identified the individual exiting the vehicle as SMAGUL. SMAGUL was then observed entering the bank. SMAGUL exited the bank soon afterwards, now holding an envelope he did not carry into the bank. Investigators then observed SMAGUL depart in his vehicle. Through financial institution records and interviews with financial institution representatives, investigators learned SMAGUL arrived at the bank to receive a check to close out the MEDICAL HOME CARE bank account. This check received by SMAGUL constitutes fraud proceeds, as only deposits from Medigap Supplemental insurance companies provided a sufficient balance to cover the check since there were no significant deposits in the account from another source. This check received by SMAGUL is depicted below.



58.    According to financial institution records, on April 3, 2024, this check was deposited into SMAGUL's personal bank account at Financial Institution 8, for

which he was the sole signer on the account. Investigators' review of the signature endorsing the check identified it as consistent with SMAGUL's signature on the signature cards from MEDICAL HOME CARE accounts he held at financial institutions that he was the sole signer upon. For example, below is a comparison between the signature card for MEDICAL HOME CARE's account at Financial Institution 7 and the endorsement of the check that was deposited into SMAGUL's personal bank account on April 3, 2024.



**CONCLUSION**

59.     Based upon the foregoing, and in support of a complaint and arrest warrant, I submit this affidavit sets forth sufficient facts to establish probable cause

to believe that, from in or around December 2023 and continuing through in or around September 2024, in the Northern District of Illinois, and elsewhere, Defendant SMAGUL, together with others, conspired to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

FURTHER AFFIANT SAYETH NOT.

STEVE WARREN
Special Agent, HHS-OIG-OI

SWORN TO AND AFFIRMED by telephone September 12, 2024.

Honorable Young B. Kim
United States Magistrate Judge

25